# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **STEVEN A. MUNCHER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:16-CV-782-VEH** |
| | ) | |
| **NCR CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

## MEMORANDUM OPINION AND ORDER

This is a civil action filed by the Plaintiff, Steven A. Muncher, against the

Defendant, NCR Corporation ("NCR"). The First Amended Complaint in this case

was filed on August 19, 2016. (Doc. 23). As alleged in the First Amended Complaint:

> [The] Plaintiff seeks to recover bonuses in the total amount of
> $210,681.00 which NCR has wrongfully withheld and refused to pay for
> the year 2015. [The] Plaintiff is entitled to these bonuses based upon the
> "2015 T&T Sales Compensation Program Additional Earnings
> Opportunity" (the "Additional Earnings Opportunity" or "AEO"). The
> AEO provided for significant bonuses in 2015 in addition to the existing
> bonus program known as the "Solution Compensation Plan" ("SCP") for
> sales representatives. At all times throughout 2015, [the] Plaintiff was
> a sales representative who was fully eligible for the additional bonuses
> under the AEO and [the] Plaintiff fully earned his AEO bonus.

(Doc. 23 at 4). Arising from these (and other) allegations, the First Amended

Complaint sets out claims for breach of contract (Count One), fraudulent inducement

(Count Two), suppression and concealment (Count Three), and "attorneys' fees" (Count Four).

The case comes before the Court on the Defendant's Partial Motion To Dismiss, filed pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure (doc. 27), and the Plaintiff's Motion To Amend the Complaint to add one additional Count for liability under the Alabama Sales Representative's Commission Act, ALA. CODE § 8-23-3, (the "ASRCA" or the "Act") (doc. 51).[1] Both motions are under submission. For the reasons stated herein, both motions will be **DENIED**.

## I.     APPLICABLE STANDARDS

### A.     Motion To Dismiss

A Rule 12(b)(6) motion attacks the legal sufficiency of the complaint. *See* FED. R. CIV. P. 12(b)(6) ("[A] party may assert the following defenses by motion: (6) failure to state a claim upon which relief can be granted[.]"). The Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957) (footnote omitted) (quoting FED. R. CIV. P. 8(a)(2)),

---

[1] The proposed Amended Complaint has no bearing on whether the pending Motion To Dismiss is due to be granted. Accordingly, the Court examines the Motion To Dismiss as applied to the allegations contained in the First Amended Complaint.

*abrogated by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007); *see also* FED. R. CIV. P. 8(a) (setting forth general pleading requirements for a complaint including providing "a short and plain statement of the claim showing that the pleader is entitled to relief").

While a plaintiff must provide the grounds of his entitlement to relief, Rule 8 does not mandate the inclusion of "detailed factual allegations" within a complaint. *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964 (quoting *Conley*, 355 U.S. at 47, 78 S. Ct. at 103). However, at the same time, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563, 127 S. Ct. at 1969.

"[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (emphasis added). "Under *Twombly*'s construction of

3

Rule 8 . . . [a plaintiff's] complaint [must] 'nudge[] [any] claims' . . . 'across the line from conceivable to plausible.' *Ibid*." *Iqbal*, 556 U.S. at 680, 129 S. Ct. at 1950-51.

A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965).

Fraud claims must be pled more specifically pursuant to Federal Rule of Civil Procedure 9(b): "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). As the Eleventh Circuit has explained,

> Rule 9(b) is satisfied if the complaint sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997).

"[I]t is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

## B. <u>Motion To Amend</u>

The Eleventh Circuit has stated:

> A district court has discretion to deny leave to amend, but "leave shall be freely given when justice so requires." FED. R. CIV. P. 15(a). "In making this determination, a court should consider whether there has been undue delay in filing, bad faith or dilatory motives, prejudice to the opposing parties, and the futility of the amendment." *Local 472 of United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada v. Ga. Power Co.*, 684 F.2d 721, 724 (11th Cir. 1982) (*citing Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)).

*Scopellitti v. City of Tampa*, No. 15-15394, 2017 WL 343518, at *4 (11th Cir. Jan. 24, 2017). "A proposed amendment may be denied for futility when the complaint as amended would still be properly dismissed.*" Coventry First, LLC v. McCarty*, 605 F.3d 865, 870 (11th Cir. 2010) (internal quotations and citations omitted). When a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *Evans v. Georgia Reg'l Hosp.*, 850 F.3d 1248, 1254 (11th Cir. 2017) (internal quotations and citations omitted).

## II. ALLEGATIONS IN THE FIRST AMENDED COMPLAINT

The First Amended Complaint alleges:

16.     Plaintiff Was A "Salesperson" Under His Employment Agreement: From December 10, 2012 until January 1, 2016, Plaintiff was employed by NCR pursuant to a written employment contract.

17.     Specifically, on December 10, Plaintiff signed a document titled "Salesperson Employment Agreement." An unexecuted copy of that Agreement is attached hereto and incorporated herein as Exhibit A.[2] (NCR retained the executed copy.)

18.     The Salesperson Employment Agreement explicitly detailed Plaintiff's "duties and responsibilities" as a salesperson at paragraph 2 as follows: "Employee shall perform services and solicit orders for products, systems, and services as may from time to time be assigned to Employee individually or to his employment classification generally."

19.     The Salesperson Employment Agreement also provided for "assigned accounts or territory" at paragraph 3.

20.     At paragraph 4, "performance expectations", the Salesperson Employment Agreement specifically provided that Plaintiff would be assigned an "annual sales objective", the attainment of which constitutes the "minimum standard of acceptable performance".

21.     The Salesperson Employment Agreement assigns no management duties to Plaintiff and nowhere designates or describes him as a "sales manager".

---

[2] Exhibit A is attached to the First Amended Complaint. It appears in the Court's CM/ECF system as doc. 23-1. Attachments to a complaint are properly considered in ruling on a motion to dismiss made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Halmos v. Bomardier Aerospace Corp.*, 404 F. App'x 376, 377 (11th Cir. 2010) (*citing Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007) and *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir.1999)).

22.     The Salesperson Employment Agreement was never modified or amended so as to change or eliminate Plaintiff's role and position as a sales representative.

23.     Contemporaneously with the Salesperson Employment Agreement, NCR also provided Plaintiff with a letter dated December 4, 2012 (the "December 4th Letter"), which described his position, his base salary and his "Solution Compensation Plan (SCP)". A true and correct copy of that unexecuted letter is attached as Exhibit B.[3] (NCR retained the executed copy.)

24.     The SCP provided for a bonus (the "SCP Bonus") to motivate sales and service employees as follows:

> **Incentive Plan -- SCP:**
>
> In addition to your annual salary, you will be eligible to participate in NCR's Solution Compensation Plan (SCP), subject to the terms of the Plan. The SCP is designed to motivate solution sales and service employees to achieve levels of enhanced performance in support of NCR's solution strategy. Incentive components under this plan are represented as a percentage of total target cash.

December 4th Letter (emphasis supplied).

25.     The formula for determining this first level SCP bonus is as follows:

> Your base to incentive split in 2012 will be 70/30%, and your total target cash for 2012 will be $225,000 on an annual basis. This equates to an annual base salary of $157,500.00 as stated above, and an annual target incentive of $67,500.00.

---

[3] Exhibit B is attached to the First Amended Complaint. It appears in the Court's CM/ECF system as doc. 23-2.

*Id*. This same salary and bonus structure remained in effect throughout Plaintiff's employment with NCR and, specifically, throughout 2015, except that his annual base salary and annual target incentive (the "SCP Bonus") increased.

26.     The December 4th Letter specifically describes Plaintiff's position as "Cisco Global Account Director", and that he would be reporting to Cheryl A. Ferrante, "Global Executive Services Sales Director".

27.     At NCR, the terms "account manager" or "account director" are synonymous and used interchangeably with the terms "sales representative" or "sales associate".

28.     Specifically, at NCR an "account manager" is not a sales manager. As the term indicates, an "account manager" is responsible for particular accounts, i.e., clients. In contrast, at NCR, "sales manager" is a person to whom sales representatives like Plaintiff report.

29.     Under the specific provisions of Plaintiff's Salesperson Employment Agreement, the actual facts and circumstances surrounding his employment, and the custom and practice at NCR, Plaintiff Muncher was a sales representative at all times throughout 2015.

30.     Plaintiff had specific sales quotas and objectives as a sales representative throughout 2015. Thus, at all times, Plaintiff was a "direct quota carrying sales associate" throughout 2015. As such, Plaintiff specifically qualified for the AEO bonus, as detailed *infra*.

31.     Although Plaintiff was appointed as an interim "lead" from February to June, 2015, this assignment did not replace, supersede, cancel or supplant his continuing employment as a sales representative consistent with his Salesperson Employment Agreement throughout 2015.

32.     Plaintiff does not seek any bonus compensation based upon, or relating in any way to, his temporary assignment as an interim "lead".

33.     Cisco: During Plaintiff's employment, Cisco Company ("Cisco") was one of NCR's principal customers.

34.     Plaintiff Muncher was NCR's principal sales representative with primary responsibility for the Cisco account. Plaintiff was the primary contributor to the four-fold increase in NCR's sales to Cisco from 2012 through 2015.

35.     Plaintiff acted as a liason with other sales representatives involved with the Cisco account but these representatives did not report to him. Plaintiff was not a sales manager of these other sales representatives.

36.     Plaintiff did not compete for incentive or bonus payments with other sales representatives.

37.     Subsequent to his employment, NCR began referring to Plaintiff as the "Global Executive Director of Sales of the Telecom and Technology ('T&T') business unit of NCR."

38.     This title was expressly intended and known by NCR to mean that Plaintiff Muncher was the principal NCR sales representative for Cisco. Under custom and accepted practice at NCR, such "fancy" terms were intended to create importance in the eyes of the customer, in this case Cisco.

39.     There is no substantive difference between the title "Cisco Global Account Director" and the title "Global Executive Director of Sales".

40.     In fact, NCR created specific geographic theaters, which included the Americas (including the United States), Europe, the Middle East and Africa, and the Asia Pacific[.] The vice president for sales in Europe was George Scheurer. The vice president for sales in the Asia Pacific was Richard Richardson. In 2015, the vice presidents for sales in the Americas were Martin Kalin and then Pete Leuzzi, who replaced Mr. Kalin.

41.     There were separately identified and designated sales managers in each of these three theaters who reported to these vice presidents for sales. In turn, sales representatives such as Plaintiff reported to these sales managers.

42.     Plaintiff never was designated as such a sales manager. At all times throughout 2015, Plaintiff continued to be a sales representative with principal responsibility for the Cisco account.

43.     The 2015 AEO Program: NCR held annual events known as the "sales kick off" ("SKO") for its various business units including the Telecom and Technology ("T&T") unit in January of each year.

44.     As an integral part of its continuing effort to increase Cisco and other revenues, NCR established a significantly enhanced incentive bonus program for 2015 titled "2015 T&T Sales Compensation Program Additional Earnings Opportunity" (the "AEO"). The AEO bonus program was in addition to the basic SCP bonus program provided for in Plaintiff's Salesperson Employment Agreement which remained in force on an annual basis through 2015.

45.     Specifically, in January, 2015, NCR conducted the SKO meeting for the T&T unit at the WDW Disney Dolphin Resort in Orlando, Florida. A principal purpose of the SKO was to introduce the new AEO bonus program.

46.     At that meeting, authorized representatives of NCR, including Sophia Williams ("Williams") and Janell Helman ("Helman"), made an oral presentation and a written presentation in the form of a Power Point (the "Power Point"), regarding this new bonus program. A true and current copy of the AEO Power Point is attached as Exhibit C[4] and incorporated herein.

47.     At all material times, Williams and Helman acted within the scope

---

[4] Exhibit C is attached to the First Amended Complaint. It appears in the Court's CM/ECF system as doc. 23-3.

of their employment with NCR.

48.    Oral Representations: Williams and Helman orally described in detail the eligibility requirements and the bonuses available under the 2015 AEO incentive program to members of the T&T sales team including Plaintiff Muncher. Plaintiff also received a "hard" copy of the Power Point.

49.    The substance of the oral presentations by Williams and Helman was that Plaintiff Muncher would be provided with a revenue target amount and a target incentive bonus which he would be paid if he exceeded his revenue target amount by more than $2.5 million.

50.    Williams and Helman also represented to Plaintiff that he would receive an additional bonus, in addition to the target incentive bonus, for each $1 million by which Plaintiff's revenues exceeded the sum of his revenue target, plus $2.5 million.

51.    Consistent with these oral representations, the 2015 AEO reflected in the Power Point presentation provided specific, objective and quantifiable eligibility criteria and benchmarks for the payment of additional earnings and bonuses to sales representatives, including Plaintiff Muncher.

52.    The Representations in the 2015 AEO Power Point: The 2015 AEO expressly stated that if Plaintiff Muncher achieved sales which were "2.5 M[million] above the annual total of all revenue measure quota objectives" (the "Plaintiff's Revenue Objective"), in that event the minimum additional payment (Minimum Bonus") payable to Muncher would be 100% of Muncher's annual target incentive (the "Target Incentive"). [Doc. 23-3 at 3).]

53.    NCR set Plaintiff's Revenue Objective at $39,591,000.00.

54.    Plaintiff's Annual Target Incentive was in the amount of $70,227.00 55. The 2015 AEO further provided that Plaintiff Muncher would receive an additional incentive payout in the amount of 50% of

his Target Incentive for each $1 million of total revenue which exceeded Plaintiff's Revenue Objective plus $2.5 million (the "Additional Bonus"). [(Doc. 23-3 at 3).]

56.    Plaintiff Earned the Minimum Bonus and the Additional Bonus: Plaintiff Muncher actually achieved revenue of $46,235,635.00. Plaintiff Muncher thereby exceeded his Revenue Objective by $6,644,635.00.

57.    Accordingly, because Muncher exceeded his Revenue Objective by more than $2.5 million, Muncher fully earned the specified Minimum Bonus of $70,227.00.

58.    In addition, because Muncher's additional earned revenue in excess of the annual Revenue Objective plus $2.5 million, exceeded $4 million, Muncher earned an Additional Bonus under the 2015 SCP in the amount of $140,454.00. This amount is calculated by multiplying half of his Target Incentive ($35,113.50) times 4 (Muncher having exceeded the sum of his Revenue Objective plus $2.5 million by $4 million).

59.    Accordingly, Plaintiff Muncher has earned total additional compensation under the 2015 AEO in the amount of $210,681.00 representing the sum of his Minimum Bonus and Additional Bonus.

60.    The criteria for earning the AEO Minimum Bonus and Additional Bonus are set forth on page 3 of the AEO Power Point attached as Exhibit C. [(Doc. 23-3 at 3).]

61.    At page 10, the AEO Power Point addresses "General Eligibility Terms and Conditions." For a Significant Contribution Incentive, the principal unpaid AEO bonus which Plaintiff claims, the employee must be a "Direct Quota Carrying Sales Associate". [(Doc. 23-3 at 10).] Plaintiff explicitly satisfied this criteria under the express terms of his Salesperson Employment Agreement and the accompanying December 4th Letter and because he was, in fact, a sales associate who "carried" a direct sales quota in 2015.

62.     In addition, Plaintiff was a "sales associate on a sales compensation plan for the full 12 months," as required by the General Eligibility Terms and Conditions. [*Id.*]

63.     The purported exclusion relating to "overlay sales or sales management" do not apply to Plaintiff for the reasons explained herein.

64.     The Incentivizer Monthly Tracking Summary: In 2013 and 2014, Plaintiff and other sales representatives received a monthly tracking summary of their progress towards meeting sales goals and qualifying for the SCP Bonus known as the Incentivizer.

65.     In 2015, NCR utilized the monthly Incentivizer for the dual purpose of tracking Plaintiff's progress of meeting both (a) his annual sales quota and eligibility for the SCP Bonus; and (b) eligibility for the additional bonus provided for by the 2015 AEO Program. Plaintiff no longer has access to his Incentivizer statements for 2015.

66.     However, in early January 2016, Plaintiff received an "Incentivizer Performance Summary" covering Plaintiff's performance as a sales representative throughout 2015. A true and correct copy of that "Incentivizer Performance Summary" is attached hereto and incorporated herein as Exhibit D.[5]

67.     Under the "Incentivizer" heading, Exhibit D states "for September compensation statement of professional services." This reference to "September" is an erroneous "quirk" of the NCR computer system, which emailed monthly performance summaries to NCR sales representatives, including Plaintiff. A true and correct copy of the Incentivizer is attached hereto and incorporated herein as Exhibit D. Exhibit D is in fact the annual itemized summary of Plaintiff's annual sales performance in 2015.

68.     Plaintiff's position as a sales representative is specifically

_____

[5] Exhibit D is attached to the First Amended Complaint. It appears in the Court's CM/ECF system as doc. 23-4.

confirmed under the heading "Employee Information" and "Position" contained within the Incentivizer. Specifically, Plaintiff's position is designated as "Sr. Global EAM".

69.     Under the custom and practice at NCR, the term "EAM" designates a sales associate or sales representative. Specifically, the acronym "EAM" refers to "Enterprise Account Manager". Under custom and practice at NCR, the term "account manager" is used interchangeably with the terms sales representative or salesperson. An "account manager" is not a "sales manager".

70.     Additional confirmation of Plaintiff's status as a sales representative is found in the Incentivizer under the heading "Bonus Summary" and "Contest/Manual Adjustment". This term refers to an "Annuity Signings Incentive". This category of bonus is provided for on page 4 of the AEO Power Point. The Annuity Signings Incentive was specifically limited to sales associates such as Plaintiff at page 10 of that Power Point.

71.     Plaintiff received an annuity signings bonus in November in the amount of $3,449.84.

72.     Because an express condition of receiving an Annuity Signings Incentive under the 2015 AEO was that Plaintiff be a "sales associate", the fact that NCR paid this Annuity Signings Incentive further confirms that Plaintiff was a sales associate and not a sales manager.

73.     Plaintiff's Interim Status As A "Lead" for the Americas Group: In or about late January, 2015, Ms. Sophia Williams asked Plaintiff, and others, to assume a temporary and "interim" role to lead certain individuals in the Americas Group focusing on technology original equipment manufacturers ("OEMs"). The purpose of this request was provide continuity while Ms. Williams searched for a replacement for the Vice President and General Manager for the Americas Group, who had resigned.

74.     This temporary assignment from Ms. Williams did not, in any

respect, replace, modify, or eliminate Plaintiff's ongoing responsibilities as a sales representative. Plaintiff continued to perform as a sales representative without any change or modification to that role throughout 2015.

75.    The "interim" assignment from Ms. Williams which ended in July 2015 did not supplant, replace, or substitute for Plaintiff's continuing role as a full time sales representative. The interim assignment merely constituted additional short term duties.

76.    Williams had actual knowledge that Plaintiff's eligibility for a substantial AEO bonus in the amount of hundreds of thousands of dollars was a material and substantial consideration for Plaintiff's continued employment with NCR.

77.    Williams had actual knowledge that Plaintiff would have refused to take on the additional assignment as an interim "lead", if he had been advised that this would disqualify him for his AEO bonus.

78.    Plaintiff's Contemplated Retirement: In early 2015, NCR and Williams, among others, had actual knowledge that Muncher was considering retirement. The 2015 SKO was intended, in part, to induce Muncher to continue his employment with NCR, given his critical role as the NCR sales representative with principal responsibility for Cisco.

79.    On April 6, 2015, Muncher hand-delivered a written letter of resignation to Williams effective June 30, 2015.

80.    During their meeting on that date, Williams refused to accept the resignation. Williams orally advised Muncher that because of his key relationship with Cisco, she and NCR needed Muncher to continue his employment with NCR throughout 2015.

81.    After speaking with Williams about the importance of his role at NCR, Muncher agreed to Williams' request that he remain with NCR throughout 2015.

82.     The promised incentive bonuses under the 2015 AEO were an essential reason for Muncher's agreement to remain with NCR.

83.     Again, Williams had actual knowledge that Muncher would not have agreed to withdraw his resignation and continue his employment with NCR if Williams had informed him that he was not eligible for the 2015 AEO bonus.

84.     Specifically in 2015, Muncher earned a base salary of approximately $157,000.00. Prior to 2015, the SCP Bonus program allowed Muncher to earn in the range of $75,000.00 above his base salary.

85.     However, the 2015 AEO provided a much greater economic incentive to Muncher because of the potential for a Minimum Bonus and Additional Bonus which substantially exceeded the bonus structure existing before 2015.

86.     Indeed, the 2015 AEO allowed Muncher the opportunity to nearly double his base salary and SCP Bonus.

87.     Plaintiff's Request that NCR Pay His Earned Bonuses: In January and February, 2016, Plaintiff Muncher contacted NCR's authorized representative, Rodney Anthony, by email to inquire about payment of his earned 2015 SCP incentive bonuses including the Minimum Bonus and the Additional Bonus. Plaintiff Muncher itemized specifically and in detail his right to receive these additional bonus payments alleged herein, totaling $210,681.00.

88.     Muncher has also made two follow-up inquiries in writing to NCR after February 2, 2016. ...[6]NCR has refused to respond substantively to Plaintiff Muncher's repeated inquiries although it initially promised to do so.

89.     Defendant NCR has wrongfully failed and refused to pay Plaintiff

---

[6] The Court has removed the color phrase "Evidencing its bad faith."

Muncher the 2015 bonus payments to which he is entitled under the 2015 SCP.

(Doc. 23 at 4-15, ¶¶16-89) (footnotes omitted).

In addition to the allegations in the First Amended Complaint, the Court will consider the statements contained in the Declaration of NCR's Vice President and General Manager Sophia Williams, which is referenced in the Complaint.[7] Ms.

---

[7] "[A] district court may consider extrinsic materials on a motion to dismiss if '[1] a plaintiff refers to a document in [his] complaint, [2] the document is central to [his] claim, [3] its contents are not in dispute, and [4] the defendant attaches the document to its motion to dismiss.'" *Mesidor v. Waste Mgmt., Inc. of Florida*, 606 F. App'x 934, 935 (11th Cir. 2015) (*quoting Fuller v. SunTrust Banks, Inc.*, 744 F.3d 685, 696 (11th Cir.2014)). In its brief in support of the motion, the Defendant discusses the declaration of Sophia Williams which it states is "referenced in Plaintiff's first amended complaint." (Doc. 28 at 7, ¶24). The citation it gives ("Doc. 14-1 at ¶¶ 3, 4, and 19") is actually a citation to the declaration itself, which is attached to evidence filed in support of NCR's Motion for Summary Judgment. Still, the First Amended Complaint does, indeed, reference the declaration. (*See*, doc. 23 at 2 at 8; doc. 23 at 16, ¶ 100). At first, the declaration is mentioned only in passing, noting that "[i]n response to Plaintiff's Complaint, NCR filed a motion for summary judgment . . . including . . . evidentiary material, consisting primarily of the Declaration of NCR's Vice President and General Manager Sophia Williams." (Doc. 23 at 2, ¶ 8). The second time, the Plaintiff states:

> 100.    Plaintiff's allegation that, at all material times, NCR had the wrongful and concealed intent not to pay an AEO bonus to Plaintiff is directly supported by the Declaration of Sophia Williams included in NCR's Evidentiary Submission in Support of its Motion, Doc 14. That Declaration explicitly demonstrates that beginning with the SKO presentation in January, 2015, when Williams and Helman made the fraudulent representations to Plaintiff alleged herein; when Williams asked Plaintiff to assume the interim "lead" position in February, 2015; and when Williams persuaded Plaintiff to continue his employment with NCR in June, 2015, Williams and NCR never intended to pay the AEO bonus to Muncher.

(Doc. 23 at 17, ¶100). This latter reference makes it clear that no party disputes the contents of the declaration, and that it is central to the Plaintiff's claims. Although the declaration is not technically "attached" to the Motion To Dismiss, it is part of the record, and the brief in support of the motion referenced the location in the record where the document is located. The Court deems this to be sufficient in order to consider the declaration without converting the motion to a

Williams states, in pertinent part:

4.      At the beginning of 2015, Mr. Muncher was employed as a Senior Global Executive Account Manager ("Senior Global Executive") in the T &T Business Unit. In that Senior Global Executive position, Mr. Muncher was NCR's leader for the Cisco account and managed the Cisco account team. In that role, he was ultimately responsible for the performance and sales results of the Cisco account managers on the team.

* * *

9.      In 2015, the Vice President for Sales for the T &T Business Unit stopped working for NCR. Following his departure, Mr. Muncher was asked to manage the Original Equipment Maintenance ("OEM") portion of the T &T Business Unit for the Americas.

10.     In February 2015, Mr. Muncher was appointed lead over the Americas group in the T&T Business Unit focused primarily on Technology OEMs (the "Americas OEM Group"). . . .

11.     Mr. Muncher received a special bonus payment to compensate him for these management responsibilities over the Americas OEM Group. He served in that management position as lead over the Americas OEM Group until July 2015.

* * *

15.     After a new Vice President of Sales was appointed, Mr. Muncher returned to his role as Senior Global Executive in the T &T Business Unit managing the Cisco account. While in that position, both before and after being appointed as lead over the Americas Technology OEM group, Mr. Muncher focused on the Annuity part of Cisco's business, while other individuals focused on the Solutions portion of the business.

---

motion for summary judgment.

16.    I am aware of the Sales Compensation Program Additional Earnings Opportunity (the "Additional Earnings Opportunity") that was announced for 2015. I was one of the individuals who presented the PowerPoint on the Additional Earnings Opportunity to the employees.

17.    The Additional Earnings Opportunity that Mr. Muncher has asked to be awarded is under the section designated as Significant Contribution Incentive ("SCI") on page two of the PowerPoint. Page nine of the PowerPoint states, however, that for the SCI program, "no overlay sales roles or sales management are eligible."

18.    The SCI also stated that my position as Vice President and General Manager "will make the final decision on all Significant Contribution Incentive recognition winners." Only one account manager received the SCI. Mr. Muncher was employed in a sales management role in 2015 and, therefore, not eligible for the SCI program.

19.    Mr. Muncher was in a sales management role in his position as Senior Global Executive and especially so when he was appointed as lead over the Americas OEM Group. Management employees are not eligible so that management employees are not competing for the incentive payments with employees they manage. For instance, the amount Mr. Muncher is seeking in the complaint filed in this action is based on the entire amount of the revenue for the Cisco account, while other account managers were also involved in portions of the Cisco account.

(Doc. 14-1 at 2-5, ¶¶ 4, 9-11, 15-19).

## III.    ANALYSIS

### A.    <u>The Motion To Dismiss</u>

The Defendant seeks dismissal of Counts Two and Three of the First Amended Complaint arguing that, under Alabama law, which is the applicable law in this

diversity case, a fraud claim cannot arise out of a failure to perform one's obligations under a contract. Further, the Defendant argues that Count Four, claiming "Attorneys Fees," should be dismissed because there is no basis for such an award in this case.

### 1. *The Fraud Claims*

The parties disagree as to whether, under Alabama law, fraud and breach of contract claims can arise out of the same transaction. In so doing, they more or less cite the same cases, yet come to different conclusions. Accordingly, this Court will review the law on this issue.

### a. *U. S. Fid. & Guar. Co. v. McKinnon* **and Its Progeny**

It has long been the rule in Alabama that "[a] mere failure to perform a contract obligation is not a tort[.]" *C & C Prod., Inc. v. Premier Indus. Corp.*, 290 Ala. 179, 186, 275 So. 2d 124, 130 (1972); *see also*, *Waters v. Am. Cas. Co. of Reading, Pa.*, 261 Ala. 252, 258, 73 So. 2d 524, 528–29 (1953) ("This Court has long since taken the position that under certain circumstances, for the breach of a contract there may be either an action of assumpsit or one in tort."); *Mobile Life Ins. Co. v. Randall*, 74 Ala. 170, 176 (1883) ("For mere breaches of ordinary contracts, without more, this action will never lie; for, in such breach of promise, there is no element of tort, in the legal sense of that term."). In the context of breach of contract claims combined with fraud claims, the seminal case appears to be *U. S. Fid. & Guar. Co. v. McKinnon*, 356

So. 2d 600, 607 (Ala. 1978).

In *McKinnon*, the plaintiff filed an action against USF&G after the insurer denied her claim under an uninsured motorists provision of a liability insurance policy issued to her mother. *McKinnon*, 356 So. 2d at 601. Although USF&G claimed that there was never an agreement to cover McKinnon, an agent of USF&G had represented to the named insured, the mother, that McKinnon was covered. McKinnon filed suit and asserted a claim for breach of the insurance contract between the mother and USF&G. She also asserted that USF&G fraudulently misrepresented that McKinnon was insured under the policy. On appeal of a jury verdict in favor of McKinnon on <u>both</u> counts, the Alabama Supreme Court wrote:

> May damages be recovered for breach of an existing contract and at the same time recover damages for fraud for representing there was a contract when, in fact, there was none? We think not. The theories of recovery are factually inconsistent, therefore, the general verdict of the jury in this case is self contradictory. It had the effect of finding both that there was a contract and that there was not.

*Id.* at 607.

In *Nat'l Sec. Fire & Cas. Co. v. Vintson*, 414 So. 2d 49, 51 (Ala. 1982) the Alabama Supreme Court made it clear that *Mckinnon* did not stand for the proposition that claims for breach of contract and fraud, arising out of the same transaction, can <u>never</u> exist in the same suit, stating:

We hold that in the narrow situation, such as the one in this case, where the plaintiff claims misrepresentation in the inception of the contract, *i.e.*, where the agent misrepresents the moment in time that the policy will take effect, the plaintiff has the right to present his case to the jury under either a breach of contract theory or the tort of misrepresentation or both, because the same facts could support a finding that the contract did exist, even though the agent misrepresented the time of its inception.

The plaintiff may then elect to submit either theory, or both, to the factfinder, ARCP 8(a), with the proper instructions by the court to the jury that it must determine whether one, or both, of these theories are supported by the evidence, if at all. If the jury returns a verdict for the plaintiff, it may only award damages under one of the theories, not both. However, the choice rests with the jury. *See, USF&G v. McKinnon*, 356 So.2d 600 (Ala.1978).

*Vintson*, 414 So. 2d at 51.

The Alabama Supreme Court again examined *McKinnon* in *Herring v. Prestwood*, 414 So. 2d 52 (Ala. 1982), a case which arose out of the execution of an option by Prestwood and his wife to sell land to Herring. After Prestwood later told Herring he was not going to sell him the land, Herring sued, alleging "fraud concerning both the inception of the option offer and the suppression of the intention not to sell once the option contract was made. The complaint also claimed damages for breach of contract." *Herring*, 414 So. 2d at 55. Distinguishing *McKinnon*, the Alabama Supreme Court wrote:

We hold that, while *McKinnon* . . . is a correct statement of the law, it only applies to the narrow situation when fraud in the inception

of a contract is alleged . . . and, therefore, does not apply to this situation because here Herring's complaint alleged fraudulent suppression of the fact that Prestwood had decided not to sell the land after signing the option offer. In this situation, the plaintiff need not forego seeking damages for breach of contract in order to recover for the fraud.

*Herring*, 414 So. 2d at 57–58.

Similarly, in *Deupree v. Butner,* 522 So. 2d 242 (Ala. 1988), a real estate developer sold a townhome to the plaintiffs and included in the contract for sale a provision that a "boat slip" was included in the price and would be built by the developer. *Id.* at 243. However, at the time of closing, the developer did not tell the plaintiffs about how difficult it was going to be to get approval from the governing authority to build the slips, and about the trouble he was having in getting them built. The plaintiffs closed on the townhome contract before they ultimately learned that a usable private boat slip would not be provided. The Alabama Supreme Court noted that "[i]n Alabama, a single transaction can support an award of damages for both breach of contract and fraud." *Deupree*, 522 So. 2d at 244 (*citing Herring*). It then distinguished *McKinnon*, writing:

In *McKinnon*, the fraud that was alleged was a representation that a contract existed when one did not. To make a determination of fraud in that case, the jury had to find that no contract existed; on the contrary, if the jury found that there was a contract, and a breach, then the jury had to find necessarily that there had been no fraud in the defendant's representation that a contract existed. In other words, the jury could not consistently have found that there was liability on both claims. The

23

fraud alleged in this case does not involve a representation about the existence of a contract between [the developer] and [the plaintiffs], but the question whether [the developer] *concealed certain facts* regarding the difficulty or impossibility of [building] the boat slips.

*Id.* at 244. The Court further stated that *McKinnon* "'only applies to the narrow situation when *fraud in the inception of the contract* is alleged.'" *Id.* (quoting *Herring*, 414 So.2d at 57-58) (emphasis added in original)). The Court then stated: "We hold that the fraud alleged in this case was not fraud in the inception of the contract, but in fraudulent concealments after the contract was made, and that the facts of this case could support both a breach of contract claim and a fraud claim." *Deupree*, 522 So. 2d at 244.

Finally, the Eleventh Circuit Court of Appeals discussed all of the above cases in *Combined Servs., Inc. v. Lynn Elecs. Corp.*, 888 F.2d 106 (11th Cir. 1989). That case arose out of a contract between Lynn Electronics Corporation ("Lynn"), a seller of telephone parts, and Combined Services, Inc. ("CSI"), a telephone manufacturer. As noted by the court:

In 1986, Lynn agreed to sell eighty cartons of telephone cords to CSI in return for payment of approximately $30,000. Lynn never delivered the telephone cords, however, and CSI sued for breach of contract and also for fraud, alleging that Lynn induced CSI to enter into the contract by willfully misrepresenting that it had the telephone cords in stock and intended to deliver them. . . . Following the trial, the jury awarded CSI $33,633.18 in compensatory damages for breach of contract, the amount of CSI's payments to Lynn under the contract plus prejudgment interest,

and an additional $150,000.00 in punitive damages for fraud.

*Combined Servs.*, 888 F.2d at 106–07. The court then explained:

> Alabama courts have consistently held that, where a party fraudulently conceals or misrepresents facts relating to its intention or ability to perform under a contract, "a single transaction can support an award of damages for both breach of contract and fraud." *Deupree v. Butner*, 522 So.2d 242, 244 (Ala.1988); *see Herring v. Prestwood*, 414 So.2d 52, 57-58 (Ala.1982); *see also National Sec. Fire & Cas. Co. v. Vintson*, 414 So.2d 49, 50-51 (Ala.1982). In such cases, a plaintiff is not required to elect between contract and fraud remedies. *Herring*, 414 So.2d at 58; *see Deupree*, 522 So.2d at 244. . . .

> These cases control our disposition of the present case. Here, as in *Deupree* and *Herring*, the defendant fraudulently misrepresented facts concerning its intention and ability to perform obligations under a contract. . . . Lynn entered into the contract knowing that it had no telephone cords to ship and breached the contract when it failed to deliver any telephone cords. CSI reasonably relied on Lynn's misrepresentations and, as a result, was induced to enter into the contract. Following *Deupree* and *Herring*, we therefore hold that CSI was entitled to recover for both breach of contract and fraud.

\* \* \*

> Lynn claims, however, that the *Deupree* and *Herring* line of cases does not control the present case. Rather, Lynn argues that this case involved fraud in the inception of a contract-for which the remedy is inconsistent with the remedy for breach of contract-and that CSI therefore had to elect between fraud and contract remedies.

> Fraud in the inception of a contract occurs when a party misrepresents a contract's effective date-a misrepresentation of law as opposed to a misrepresentation of material fact as discussed above. *See U.S. Fid. & Guar. Co. v. McKinnon*, 356 So.2d 600, 607 (Ala.1978); *Vintson*, 414 So.2d at 50-51; *see also Deupree*, 522 So.2d at 244;

*Herring*, 414 So.2d at 57-58. For example, in *McKinnon* and *Vintson*, insurance agents represented that the plaintiffs' policies would take effect immediately, but the policies did not actually take effect until delivery.[8] When the plaintiffs suffered losses prior to delivery of their policies, the insurance companies refused to pay their claims. The plaintiffs sued under both fraud and contract theories, hoping under either theory to recover the equivalent of what the policies would have paid. As both the *McKinnon* and *Vintson* courts held, contract and fraud theories are inconsistent in such cases: a verdict in favor of the plaintiff on the fraud claim means that no contract existed, and a verdict on the contract claim means that no fraud occurred. In such a case, therefore, a plaintiff must elect between fraud and contract remedies. *See Deupree*, 522 So.2d at 244; *Vintson*, 414 So.2d at 51-52; *McKinnon*, 356 So.2d at 607-08.

The present case, however, is not a fraud-in-the-inception case. Lynn's misrepresentations were not misrepresentations of law regarding the contract's effective date. Rather, they were misrepresentations of fact regarding Lynn's intention and ability to perform its obligations under that contract. We therefore reject Lynn's argument that this case involved a fraud-in-the-inception claim, in which case Alabama law would have required CSI to elect between fraud and contract remedies.

---

[8] This Court respectfully disagrees with the Eleventh Circuit's reading of the facts of *McKinnon*. In *McKinnon*, the plaintiff, Mrs. McKinnon was never a named insured on the policy. The named insured (Mrs. Haney) was <u>told</u> by a representative of the insurer that McKinnon was covered, a representation upon which Haney and McKinnon relied. The Alabama Supreme Court then held:

> based upon facts within its knowledge (Mrs. McKinnon's residence elsewhere than in her mother's household); the representations made that Mrs. McKinnon was covered; and reliance on those representations by both Mrs. Haney and Mrs. McKinnon, that USF&G is estopped to deny Mrs. McKinnon is insured under Mrs. Haney's policy.

*McKinnon*, 356 So. 2d at 606. Regardless, the distinction noted by the Eleventh Circuit is still applicable. In *McKinnon* there was an alleged misrepresentation <u>as to whether there was a contract at all.</u> There was no allegation that the insurer entered into the contract with the express intention to never pay on the policy.

\* \* \*

The present case involved misrepresentations of fact, not of law. CSI reasonably relied on those misrepresentations and, as a result, was induced to enter into a contract with Lynn. Under these circumstances, Alabama law allows CSI to recover for both breach of contract and fraud.

*Combined Servs., Inc.*, 888 F.2d at 107–08; *see also, Sweetwater Inv'rs, LLC v. Sweetwater Apartments Loan LLC*, No. 1:10-CV-223-WKW, 2010 WL 4904673, at \*5, 6 (M.D. Ala. Nov. 24, 2010) (Watkins, J.) (quoting *Combined Services* for the proposition that "where a party fraudulently conceals or misrepresents facts relating to its intention or ability to perform under a contract, a single transaction can support an award of damages for both breach of contract and fraud," and noting the case survived a motion to dismiss because "as alleged, not only did [the defendants] breach the [a]greement when it failed to deliver the Loan and Loan File to Plaintiff, but Defendants also induced Plaintiff to enter into the Agreement knowing that they did not have the authority or ability to transfer the Loan and Loan File to Plaintiff, but representing that they did have such authority.") (internal quotations and citations omitted).

### b.    Justice Houston's Concurrences

The parties have cited to the Court two concurring opinions written by

Alabama Supreme Court Justice J. Gorman Houston, Jr. in *Dickinson v. Land Developers Construction Co.*, 882 So.2d 291 (Ala.2003) and *Hunt Petroleum Corp. v. State of Alabama*, 901 So.2d 1 (Ala.2004). The Court will discuss each in turn.

### (1)  *Dickinson v. Land Developers Construction Co.*

Justice Houston, who concurred in the *Deupree* decision without opinion, discussed that case in his concurrence in *Dickinson*, writing:

> While the *Deupree* decision characterized the alleged fraud at issue in that case as fraudulent suppression, 522 So.2d at 244 ("[w]e hold that the fraud alleged in this case was not fraud in the inception of the contract, but in fraudulent concealments after the contract was made"), given the fact that the plaintiffs had not yet closed on their townhome and the fact that they alleged that they would not have closed on the townhome if they had not been lied to, the fraud alleged in *Deupree* appears to favor a claim for fraudulent inducement[9] (to close on the townhome and "complete" the contract). Regardless, it is clear that to assert a fraud claim that stems from the same general facts as one's breach-of-contract claim, <u>the fraud claim must be based on representations independent from the promises in the contract and must independently satisfy the elements of fraud</u>.

*Dickinson*, 882 So. 2d at 304 (Houston, J., concurring) (emphasis added). He then wrote:

> However, it is a universally held principle that the "mere failure to perform a [contractual] promise does not constitute fraud." *John Brown Automation, Inc. v. Nobles*, 537 So.2d 614, 618 (Fla.Dist.Ct.App.1989). <u>In fact, a party to a contract may intentionally, and even in bad faith</u> (except in the insurance context), *see American*

---

[9] Not to be confused with fraud in the <u>inception</u>.

*Cast Iron Pipe Co. v. Williams*, 591 So.2d 854, 857 (Ala.1991), break a contractual promise without that action becoming a fraud or other tort. While perhaps we have not clearly described the difference between breach of contract and fraud, I find the following discussion from a Florida court to be very helpful and accurate:

> "The appealed order was entered before the Florida supreme court issued its decision in *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So.2d 1238 (Fla.1996). HTP emphasizes the distinctions between a suit for fraud in inducing the contract and a suit for breach of contract. The court explained these are two very different causes of action with separate and consistent remedies. 685 So.2d at 1239. The HTP court further explained the reason for retaining a cause of action for fraud in the inducement by quoting a widely cited Michigan case, *Huron Tool and Eng'g Co. v. Precision Consulting Services, Inc.*, 209 Mich.App. 365, 532 N.W.2d 541, 545 (1995):
>
>> " 'The distinction between fraud in the inducement and other kinds of fraud is the same as the distinction drawn by a New Jersey federal district court between fraud extraneous to the contract and fraud interwoven with the breach of contract. With respect to the latter kind of fraud, the misrepresentations relate to the breaching party's performance of the contract and do not give rise to an independent cause of action in tort.'
>
> "*Id*. at 1240. If a fraud is perpetrated which induces someone to enter into a contract, there is a cause of action for fraud and the remedies attendant to that particular tort are available. If there is no fraud inducing someone to enter into a contract, but the contract is breached, the cause of action sounds in contract and contract remedies are

available. <u>The fact that the measure of damages may be the same for both causes of action does not make the fraud claim disappear.</u> It is no more desirable to have tort law drown in a sea of contract than to have contract law drown in a sea of tort. The notion that a knowing fraud perpetrated to induce someone to enter into a contract can be extinguished by the simple expedience of including the fraudulent representation in the contract makes no sense. The problem appears to be that there is a lot of loose language being used to describe these principles and the confusion is compounded with almost every case.

"What the above-quoted language from *Huron Tool* means is no mystery and is already explained in existing Florida law. *John Brown Automation, Inc. v. Nobles*, 537 So.2d 614 (Fla. 2d DCA 1988), review denied, 547 So.2d 1210 (Fla.1989). To understand it merely requires an appreciation of the distinction between fraud in the inducement and fraud in the performance of a contract. The New Jersey case referenced in the *Huron Tool* opinion is plainly a fraud in the performance case. *Public Service Enterprise Group, Inc. v. Philadelphia Elec. Co.*, 722 F.Supp. 184, 201 (D.N.J.1989).

"A few examples may be helpful. Suppose someone offers to sell you a particular emerald for $5,000 and, in order to induce you to buy it, represents to you that it is 'top quality' and that it has not been filled. You buy it based on the factual representation that the stone is unfilled but later you learn that it, in fact, had been filled. If the seller knew the emerald had been filled but lied in order to trick you into agreeing to buy it, you have a cause of action for fraud with all its attendant remedies. You may also have an action for breach of contract. <u>The fact that the same measure of damages (the difference in value between a filled emerald and an unfilled emerald) may be available under both the tort and the breach of contract does not</u>

cause the tort to disappear. Nor does the inclusion of the fraudulent representation as an express warranty in the contract preclude the tort remedy.

"Suppose, on the other hand, on December 1, 1997, the same person enters into a contract with you pursuant to which, in exchange for your payment of $5,000, he will deliver to you on January 1, 1998 a 'top quality,' unfilled emerald. If, on January 1, 1998, he instead delivers an emerald that has been filled, he has only breached the contract. It is immaterial whether, when he delivered the emerald on January 1, 1998, he knew the emerald was filled. This is breach of contract pure and simple and cannot be converted into a fraud. Nor is it a fraud if the emerald is not 'top quality' because such a representation concerning the quality of the product is essentially opinion, not fact, and the characteristics of the product are a matter that the parties can expect to control by contract. HTP at 1240. The essential difference lies in the nature of fraud itself, which is a knowing false statement of fact made with the intent that it cause action in reliance and it does cause such action to the detriment of the victim of the knowing false statement. In a fraud in the inducement situation, if there is damage based on a decision to contract that would otherwise not be made, a cause of action for fraud exists. There isn't necessarily damage where there is fraud, which is why no cause of action for fraud exists unless there is damage due to fraud that is separate from damages that may result from any subsequent contractual breach. This principle has nothing to do with the economic loss rule. The economic loss rule does not preclude a tort claim which is based on conduct which is separate and distinct from conduct constituting a breach of contract, if the fraud itself causes damage."

*La Pesca Grande Charters, Inc. v. Moran*, 704 So.2d 710, 712–13 (Fla.Dist.Ct.App.1998) (footnotes omitted).

*Dickinson*, 882 So. 2d 304–05 (emphasis added).[10]

## (2)    *Hunt Petroleum Corp. v. State of Alabama*

In his concurring opinion in *Hunt*, Justice Houston quoted the above language

from *Dickinson* and then wrote:

> <u>In other words, a fraud claim cannot be maintained simply because a party—even mistakenly, intentionally, or maliciously—did not properly perform a contractual obligation</u>. Additionally, not all "fraudulent" acts, as the term "fraudulent" is broadly understood, give rise to a cause of action for fraud. Fraud, as a cause of action, requires some damage stemming from reliance on a misrepresentation or suppression intended to induce that reliance, i.e., reliance that caused someone to act or to refrain from acting. . . . *Deupree* . . .is the case most frequently cited . . . for the proposition that a party can maintain an action for both fraud and breach of contract stemming from the same set of operative facts. Perhaps *Deupree* is the case that initiated the current misunderstanding between breach of contract and fraud; if so, let this writing assist in ending it. *Deupree* does not stand for the proposition that one can maintain a fraud claim based merely on an alleged misrepresentation that, or suppression of the fact that, a party has not properly performed, or has intentionally not performed, a contractual obligation. <u>*Deupree* involved "a knowing false statement of fact *made with the intent that it cause action in reliance and it [did] cause such action to the detriment of the victim* of the knowing false statement</u>." *La Pesca Grande Charters, Inc. v. Moran*, 704 So.2d 710, 713 (Fla.Dist.Ct.App.1998) (emphasis added).

*Hunt*, 901 So. 2d at 12-13 (Houston, J., concurring) (emphasis by underlining

---

[10] The Plaintiff argues that *Dickinson* is distinguishable "in that it addressed an appeal of the trial court's grant of summary judgment to the defendants after discovery, not the facial plausibility of the plaintiff's fraud claims at issue here." (Doc. 36 at 10, n. 6). However, *Dickinson* is cited for the <u>law</u> stated in Justice Houston's concurrence, so the procedural posture of each case is irrelevant.

added).[11]

**(3)** **Justice Houston's Opinions Correctly and Persuasively Summarize Alabama Law on This Issue**

In sum, Justice Houston's concurrences explain that there <u>can</u> be fraud and breach of contract claims which arise out of the same set of facts. However, the fraud claim must be based on representations independent from the promises in the contract and must independently satisfy the elements of fraud. One scenario which satisfies the requirement of "independence" is where the Defendant makes a knowing false statement of fact with the intent that it cause action in reliance (entering into the contract) and it does cause such action to the detriment of the Plaintiff.[12]

---

[11] The Plaintiff argues that the procedural posture of *Hunt* (appeal from jury verdict and denial of post-judgment motions) makes it distinguishable from the instant case. (Doc. 36 at 8-9and *id.* at n. 5). However, *Hunt* is cited for the <u>law</u> stated in Justice Houston's concurrence, which this Court has already found to be persuasive. *See Townson v. Koch Farms, LLC*, No. 4:13-CV-1703-VEH, 2014 WL 1618376, at *2 (N.D. Ala. Apr. 22, 2014) (Hopkins, J.).

[12] In his concurrence in *Dickinson*, Justice Houston also quotes the following language from *Moran*: "[N]o cause of action for fraud exists unless there is damage due to fraud that is separate from damages that may result from any subsequent contractual breach." *Dickinson*, 882 So. 2d 305 (*quoting Moran*, 704 So.2d 710, 712–13). This statement appears to be in direct contradiction to the following statement, also from *Moran*, and also quoted by Justice Houston in *Dickinson*: "The fact that the measure of damages may be the same for both causes of action [(breach of contract and fraud)] does not make the fraud claim disappear." *Dickinson*, 882 So. 2d 304 (*quoting Moran*, 704 So.2d 710, 712–13). As will be shown *infra*, the latter statement is consistent with Alabama law, and the "emerald" example cited in *Moran*. The Court rejects the former statement as internally inconsistent with the example cited, and Alabama law. *But see*, *Jenkins v. State Farm Fire & Cas. Co.*, No. 2:11-CV-350-WKW, 2011 WL 3359996, at *3 (M.D. Ala. Aug. 4, 2011), at *3 (Watkins, J.) ("[T]he fraud claim does not allege any damage separate from the damage resulting from State Farm's alleged breach of the insurance contract. Accordingly, Mr. and Mrs. Jenkins's fraud claim fails as a matter of law."); *McNair v. Macon*

Justice Houston's statements in *Dickinson* and *Hunt* are not binding on this Court as they do not appear in the majority opinion of either case. Further, to this Court's knowledge, they have not been adopted by the Alabama Supreme Court or the Alabama Court of Civil Appeals in any other case.[13] Still, Justice Houston's approach is in line with long-settled Alabama law. *See*, *Goodyear Tire & Rubber Co. v. Washington*, 719 So. 2d 774, 776 (Ala. 1998) ("The burden is on the plaintiff to prove that when the promise was made the defendant intended to deceive. The plaintiff cannot meet his burden merely by showing that the alleged promise ultimately was not kept; otherwise, any breach of contract would constitute a fraud.")

---

*Cty. Greyhound Park, Inc.*, No. 3:10-CV-560-WKW, 2011 WL 867220, at *5 (M.D. Ala. Mar. 14, 2011) (Watkins, J.) ("Fraud in the performance cases do not give rise to claims for damages for fraud, unless 'there is damage due to fraud that is separate from damages that may result from any subsequent contractual breach.'") (*quoting Dickinson*, 882 So.2d at 305). That having been said, the Court still court holds that the measure of damages is <u>one way</u> to determine whether the fraud claims are "independent from the promises in the contract."

[13] Also, at least one other former Justice of the Alabama Supreme Court, Justice Lyons, has criticized Justice Houston's approach in a special concurrence of his own. *See*, *Exxon Mobil Corp. v. Alabama Dep't of Conservation & Nat. Res.*, 986 So. 2d 1093, 1131 (Ala. 2007) (Lyons, J., concurring) (writing that Justice Houston "attempted to limit the holding in *Deupree* to pre-closing suppression, beyond, I respectfully submit, the previously quoted holding of the Court clearly recognizing post-closing conduct as part of the basis for the fraud claim.") (citing *Bethel v. Thorn*, 757 So.2d 1154 (Ala.1999)). Importantly, Justice Lyons did not disagree that fraud and contract claims could both arise out of the same transaction. His opinion focuses instead on whether fraud claims based on conduct which occurred <u>during the performance of the contract</u>, as opposed to as an inducement to enter into it, could be the basis of a proper claim under these circumstances.

(citations omitted)[14]; *Weller v. Riverchase Ctr. Assocs.*, 597 So. 2d 206, 208 (Ala. 1992) ("'For a promise to perform an act in the future to constitute fraud, there must be an intent not to perform the promise at the time it is made.'") (*quoting McIntyre Elec. Service, Inc. v. Southtrust Bank of Mobile*, 495 So.2d 1043 (Ala.1986) *in turn citing American Pioneer Life Ins. Co. v. Sherrard*, 477 So.2d 287 (Ala.1985)); *Evans v. Adam's Rib, Inc.*, 289 Ala. 377, 380, 267 So. 2d 448, 450 (1972) ("[A] failure to fulfill a mere promise . . . does not give rise to actionable fraud unless it be alleged and shown that the alleged oral agreements were made with intent to deceive and <u>with no intent at the time the representations were made to carry them out</u>.") (emphasis added); *McAdory v. Jones*, 71 So.2d 526, 528 (Ala.1954) ("When fraud is the basis upon which relief is sought against a contract and the fraud is dependent upon a breach of the covenant by the other party to the contract, it is usually necessary to allege and prove that at the time the contract was made the covenantor had no intention of complying with his obligation, but that he entered into it at that time with the intention of defrauding the other party to the contract."); *see also*, *Brown-Marx Assocs. v. Emigrant Sav. Bank*, 703 F.2d 1361 (11th Cir. 1983) ("[U]nder Alabama

_____

[14] The Plaintiff argues that *Goodyear*, which is cited by the Defendant, "is completely distinguishable because it involved a motion for a directed verdict at the close of the evidence, where the plaintiff failed to present substantial evidence of a present intent by defendant not to perform the promised acts." (Doc. 36 at 8). This Court, and for that matter the Defendant (*see* doc. 28 at 13), cite the case merely for its statement of the <u>law</u>, which is correct, no matter the procedural posture of either case.

law failure to fulfill promises does not give rise to actionable fraud unless it is alleged and proved that the representations were made with intent to deceive and with no intent at the time the representations were made to carry them out. . . . Failure to perform a promise is not of itself adequate evidence of intent to support an action for fraud. . . . A mere breach of a contractual provision is not sufficient to support a charge of fraud. ") (*citing Evans*, 267 So.2d at 450, *Bracewell v. Bryan*, 57 Ala.App. 494, 329 So.2d 552 (Ala.Civ.App.1976), and *McAdory*, 71 So.2d at 528))[15]; *Exxon Mobil Corp. v. Alabama Dep't of Conservation & Nat. Res.*, 986 So. 2d 1093, 1130 (Ala. 2007) (Lyons, J., concurring) ("[I]f a promise to perform in the future is made with no intention to perform at the time the promise was made, it is promissory fraud and will give rise to an action in tort for which compensatory and punitive damages may be recovered.") (citations omitted).

Further, several other Judges have also found Justice Houston's analysis to be sound. *See*, *TFO, Inc. v. Vantiv, Inc.*, No. 1:16 CV 00971 SGC, 2017 WL

---

[15] *Brown-Marx* was cited by the Defendant in its original brief <u>only</u> for its statement of Alabama law. (Doc. 28 at 12-13). The Plaintiff argues:

> Moreover, the procedural posture of the *Brown-Marx* decision was that of appellate review of a district court's grant of summary judgment to defendant, not only after discovery was completed, but also after the district court had granted defendant's motion for a new trial after a jury had ruled for the plaintiff), and thus has no application here at the pleadings stage.

(Doc. 36 at 8). Neither the Defendant, nor this Court, cites to *Brown-Marx* as a factually similar case.

1196851, at *2 (N.D. Ala. Mar. 31, 2017) (Cornelius, M.J.) (noting that "Courts

sitting in this district have held that, in order to state a cognizable fraud claim under

Alabama law, the conduct alleged must be independent from a breach of contract.")[16];

*ADTRAV Corp. v. Duluth Travel, Inc.*, No. 2:14-CV-56-TMP, 2016 WL 4614842, at

*21 (N.D. Ala. Sept. 6, 2016) (Putnam, M.J.) ("Under Alabama law '[i]t is clear that

to assert a fraud claim that stems from the same general facts as one's

breach-of-contract claim, the fraud claim must be based on representations

independent from the promises in the contract and must independently satisfy the

elements of fraud.'") (quoting *Hunt*, 901 So. 2d at 11, Houston, J. concurring);

*Holmes v. Behr Process Corp.*, No. 2:15-CV-0454-WMA, 2015 WL 7252662, at *3

(N.D. Ala. Nov. 17, 2015) (Acker, J.) ("'Regardless, it is clear that to assert a fraud

claim that stems from the same core facts as one's breach-of-contract claim, the fraud

claim must be based on representations independent of the promises contained in the

contract and must independently satisfy the elements of fraud.'") (quoting *Hunt*, 901

So. 2d at 10-11, Houston, J., concurring)[17]; *Emergency Response Specialists, Inc. v.

CSA Ocean Scis., Inc.*, No. 2:14 CV 2214 WMA, 2015 WL 1865453, at *1 (N.D.

---

[16] Judge Cornelius cited *Stone v. Koch Farms of Gadsden, LLC*, No. 12-3777-RBP, 2013 WL 121477, at *2–3 (N.D. Ala. Jan. 8, 2013) (Propst, J.), and *Townson v. Koch Farms, LLC*, No. 13-1703-VEH, 2014 WL 1618376, at *2 (N.D. Ala. Apr. 22, 2014) (Hopkins, J.). *See TFO, Inc.*, 2017 WL 1196851, at *2.

[17] Judge Acker also cited *Stone* and *Townson*.

Ala. Apr. 23, 2015) (Acker J.) (same); *Townson*, 2014 WL 1618376, at *2 ("'[T]o assert a fraud claim that stems from the same general facts as one's breach-of-contract claim, the fraud claim must be based on representations independent from the promises in the contract and must independently satisfy the elements of fraud.'") (quoting *Hunt*, 901 So. 2d at 10-11, Houston, J., concurring); *Hood v. Liberty Ins. Corp.*, No. CIV.A. 13-0271-CG-M, 2013 WL 3894958, at *4 (S.D. Ala. July 29, 2013) (Granade, J.) ("'[A] fraud claim cannot be maintained simply because a party—even mistakenly, intentionally, or maliciously—did not properly perform a contractual obligation. Additionally, not all "fraudulent" acts, as the term "fraudulent" is broadly understood, give rise to a cause of action for fraud. Fraud, as a cause of action, requires some damage stemming from reliance on a misrepresentation or suppression intended to induce that reliance, i.e., reliance that caused someone to act or to refrain from acting.'") (quoting *Hunt*, 901 So.2d at 12-13, Houston, J., concurring); *Stone*, 2013 WL 121477, at *1 (quoting Justice Houston's concurrences in *Hunt* and *Dickinson* at length); *McNair*, 2011 WL 867220, at *5 (fraud claims survived a motion to dismiss "[b]ecause [the plaintiff's] allegations involve a 'knowing false statement of fact made with the intent that it cause action in reliance and it [did] cause such action to the detriment of the victim of the knowing false statement[.]'") (quoting *Hunt*, 901 So.2d at 13, Houston, J., concurring); *Pearson's*

*Pharmacy, Inc. v. Express Scripts, Inc.*, 505 F. Supp. 2d 1272, 1276 (M.D. Ala. 2007) (Watkins, J.) ("'[T]o assert a fraud claim that stems from the same general facts as one's breach-of-contract claim, the fraud claim must be based on representations independent from the promises in the contract and must independently satisfy the elements of fraud.'") (quoting *Hunt*, 901 So.2d at 10, Houston, J., concurring); *but see*, *Morris v. Auto. Ins. Co. of Hartford, Conn.*, No. 2:12-CV-00837-RDP, 2012 WL 3637624, at *5 (N.D. Ala. Aug. 17, 2012) (Proctor, J.) ("[T]he court notes that neither Justice Houston's concurrence nor the *Pearson's Pharmacy* decision are binding on this court. The Middle District of Alabama in *Pearson's Pharmacy* seems to have adopted Justice Houston's concurrence in *Hunt Petroleum*. . . . [T]his court declines to follow that lead.").

After reviewing the law discussed above, the Court is persuaded that Justice Houston's concurrences in *Dickinson* and *Hunt*, as summarized by this Court above, are correct statements of Alabama law.

### c.   Applied to the Instant Facts

Having determined that, under the circumstances described above, claims for fraud and breach of contract can arise out of the same transaction, the Court must now determine whether the fraud-based claims in <u>this</u> case survive.

### (1)   The Plaintiff Has Adequately Pleaded His Fraud-

## Based Claims

As the chart below illustrates, much of the same conduct is set out in both the

breach-of-contract and the fraud-based counts:

| Breach of Contract Claim (Count One) | Fraudulent Inducement Claim (Count Two) | Suppression/Conceal ment Claim (Count Three) |
|---|---|---|
| "The AEO, as presented to Muncher orally and in writing, constitutes an enforceable agreement between NCR and Plaintiff Muncher." (Doc. 23 at 15, ¶91). | "At the 2015 SKO, and as alleged herein, NCR specifically represented orally and in writing that, if Plaintiff Muncher achieved sales goals as described in the 2015 AEO, he would receive the bonus compensation as described herein. (Doc. 23 at 16, ¶96); | "NCR and its representatives, Williams and Hellman, undertook to describe the 2015 SCP both orally and in writing at the SKO, as alleged herein." (Doc. 23 at 18, ¶108). |
| "Under the 2015 AEO, NCR owes Plaintiff Muncher $210,681.00, which NCR has failed to pay." (Doc. 23 at 15, ¶92). | "Plaintiff Muncher reasonably relied on the representations made at the 2015 SKO and contained in the 2015 AEO regarding bonus incentives both at that time and when he agreed to continue his employment with NCR on April 6, 2015." (Doc. 23 at 16, ¶97); "Based upon the express promise that he would receive the additional bonuses specified by NCR in the 2015 AEO, Plaintiff Muncher exerted extraordinary sales efforts in behalf of NCR throughout 2015, which resulted in sales to Cisco more than $6 million in excess of Plaintiff's Revenue Objective." (Doc. 23 at 16, ¶98) (emphasis added); "Plaintiff Muncher specifically relied on NCR's representations, promises and assurances in continuing his employment and in the course of performing his duties with NCR throughout 2015 and in achieving the extraordinary sales revenues which entitled him to the Minimum Bonus and the Additional Bonus which he seeks in this Complaint." (Doc. 23 at 17, ¶103) (emphasis added). | "Plaintiff Muncher was induced to act by the suppression and concealment of NCR's intent that NCR would not honor the oral and written promises to pay incentive bonuses to Plaintiff Muncher under the 2015 AEO if he achieved his revenue objectives." (Doc. 23 at 18, ¶113). |

| | | |
|---|---|---|
| "NCR has wrongfully breached its oral and written agreement and contractual obligation to pay that amount to Plaintiff Muncher." (Doc. 23 at 15, ¶93). "Plaintiff Muncher is entitled to recover compensatory damages in the amount of $210,681.00 against NCR by reason of said breach." (Doc. 23 at 15, ¶94). | "Plaintiff has been damaged as a result of his reliance on NCR's fraudulent provisions." (Doc. 23 at 17, ¶104); "As a result of NCR's fraudulent inducement, Plaintiff Muncher is entitled to receive additional bonus compensation in the amount of $210,681.00 plus punitive damages to punish and deter NCR from its wrongful conduct as alleged herein." (Doc. 23 at 17, ¶105). | "As a result of NCR's suppression and concealment, Plaintiff Muncher is entitled to receive additional bonus compensation in the amount of $210,681.00 plus punitive damages to punish and deter NCR from its wrongful conduct as alleged herein." (Doc. 23 at 19, ¶116). |

The Defendant argues that the similarity noted above is fatal to the Plaintiff's fraud-based claims because "[the] same allegations cannot support a fraud claim because the purported misrepresentation is identical to the terms of NCR's performance that Muncher claims comprised their agreement." (Doc. 28 at 15; *see also* doc. 40 at 4-7 (comparing allegations in Amended Complaint).[18] However, the Plaintiff also alleges that:

–    "[A]t the time that the oral and written promises were made to him [in

---

[18] The Defendant does not argue that the Plaintiff has failed to plead the "who, what, when, where, and how of the allegedly false statements." *Mizzaro*, 544 F.3d at 1237. Regardless, the Court notes that the Plaintiff has pleaded that NCR instituted the AEO Bonus, which was in addition to the basic SCP bonus program, and that, in January 2015, at a meeting in Walt Disney World's Dolphin Resort in Orlando, Florida, Sophia Williams and Janell Helman, orally and in writing (via a Power Point presentation), represented that the Plaintiff would receive bonuses based upon reaching target amounts. (Doc. 23 at 8-10, ¶¶43-55). These allegations satisfy the requirements of Rule 9(b).

January 2015], NCR had the then present intent that it would not fulfill its promises of additional bonus compensation to Plaintiff Muncher under the 2015 AEO, whether or not he achieved the revenue goals specified in the Program." (Doc. 23 at 16, ¶99).

–      "[I]n January, 2015, when Williams and Helman made the fraudulent representations to Plaintiff alleged herein; when Williams asked Plaintiff to assume the interim 'lead' position in February, 2015; and when Williams persuaded Plaintiff to continue his employment with NCR in June, 2015, Williams and NCR never intended to pay the AEO bonus to Muncher." (Doc. 23 at 16, ¶100).

–      "Under these facts and circumstances, the terms, conditions and promises in the 2015 AEO, as presented to Plaintiff Muncher, constituted fraudulent representations when made because NCR did not intend to perform its said promises.") (doc. 23 at 17, ¶101).

In other words, <u>the Plaintiff alleges conduct independent from the promises in the contract</u> in that he contends that the Defendant made a knowing false statement of fact with the intent that it cause action in reliance (entering into the contract).

Notably, the <u>only</u> factual support for this claim is a vague reference to the declaration of Sophia Williams, which the Plaintiff alleges "explicitly demonstrates

that . . . NCO never intended to pay the AEO bonus to Muncher." (Doc. 23 at 16,

¶100). However, the Amended Complaint fails to explain, or set out, which portions

of that declaration support his claim. Further, upon its own examination of the

declaration, the Court sees no facts which support such an assertion. Regardless, in

light of the detail provided in the Amended Complaint as to the "who, what, when,

where, why, and how" of the alleged fraud, and because "[m]alice, intent, knowledge,

and other conditions of a person's mind may be alleged generally," FED. R. CIV. P.

9(b), the Court finds the pleading of intent to be sufficient.[19]

---

[19] The Defendant's initial brief cites *Abrams v. CIBA Specialty Chemicals Corp.,* No. CIV.A. 08-0068WSB, 2008 WL 4183344, at *7 (S.D. Ala. Sept. 10, 2008) (Steele, J.). (Doc. 28 at 23-24). In that case, Judge Steele dismissed fraud claims, noting that "plaintiffs have pleaded fraud and misrepresentation in exceedingly general terms via references to production of unspecified reports, studies, videos and publicity guides to government officials and the general public, without any indication as to the contents or timing of same, and all subject to the conspicuous 'upon information and belief' disclaimer/caveat. Such averments clearly fall well shy of the strictures of Rule 9(b) as interpreted by the Eleventh Circuit." It also cites *Strong v. Blue Bell Creameries*, No.: 1:15-CV-1978-VEH, 2016WL 3402058 at *4, n. 8 (N.D. Ala. June 21, 2016) (Hopkins, J.) (Doc. 28 at 24). In *Strong*, the undersigned similarly held that the allegation that "[u]pon information and belief, the Defendant knew that Strong could no longer physically work as a Palletizer," was mere "speculation." The opinion in *Strong* is distinguishable because it did not concern a fraud claim, and Rule 9(b) is clear that, in fraud claims, "intent" can be alleged "generally." Judge Steele's opinion in *Abrams* is distinguishable because he held that the phrase "upon information and belief" was insufficient in the context of fraud allegations which were otherwise "exceedingly general" and "unspecified." That is not the case here.

The Defendant also cites several federal district court and Alabama state court cases which establish the elements of "promissory fraud." *See* doc. 28 at 21-23 (and cases cited therein). However, the appropriate pleading standard is governed by the Federal Rules of Civil Procedure and cases which interpret those rules, not cases interpreting the elements of the Alabama tort of promissory fraud. Further, Rule 9(b) of the Alabama Rules of Civil Procedure, like its federal counterpart, also notes that "[m]alice, intent, knowledge, and other condition of

## (2) The Plaintiff Has Adequately Pleaded Detrimental Reliance

The Defendant also argues that the Plaintiff's fraud-based claims fail because

---

mind of a person may be averred generally." ALA. R. CIV. P. 9(b). Of the cases cited by the Defendant, none of those which arose in the context of a motion to dismiss held that specific facts supporting the intent to deceive need be pled. *See, e.g, Bethel v. Thorn*, 757 So. 2d 1154, 1158 (Ala. 1999) ("'Rule 9(b) [of the Alabam Rules of Civil Procedure] . . . provides that conditions of the mind, such as malice, intent or knowledge, may be averred generally since further specification in such cases is possible only by pleading the evidence.'") (quoting committee notes to Rule 9(b) ALA. R. CIV. P.). Indeed, in *Bethel*, the Alabama Supreme Court wrote:

> Thorn argues that Bethel has failed to allege with sufficient particularity facts showing that when Thorn made the alleged promises he knew the promises were false and that at that time he did not intend to perform the promised acts, but intended to deceive Bethel. We disagree. "[I]ntent [and] knowledge ... may be averred generally." Rule 9(b), ALA. R. CIV. P.; *see also id.* Committee Comments ("[K]nowledge by the defendant of the falsity of the representation ... can still be generally alleged.... Rule 9(b) also provides that conditions of the mind, such as ... intent or knowledge, may be averred generally...."). Bethel alleges that Thorn and Diesel "knew that the ... representations were false at the time that they were made" and that "[Thorn and Diesel] made [the alleged promises] with the intention and knowledge that the contract[s] would not be performed as promised." Bethel's general allegations that Thorn knew the promises were false at the time they were made and that Thorn intended and knew that the contracts would not be performed met the requirements of Rule 9(b). Accordingly, the allegations in Counts III and V are sufficient to state claims of promissory fraud upon which relief can be granted against Thorn.

*Bethel v. Thorn*, 757 So. 2d 1154, 1159–60 (Ala. 1999); *see also, Crum v. Johns Manville, Inc.,* 19 So. 3d 208, 217–18 (Ala. Civ. App. 2009) ("'knowledge by the defendant of the falsity of the representation and reliance on the representation by the plaintiff can still be generally alleged'") (quoting committee comments); *Robinson v. Allstate Ins. Co.*, 399 So. 2d 288, 290 (Ala. 1981) (dismissing case because "[t]he complaint fails to allege any intent . . . not to perform," not for lack of facts supporting such a claim).

the Plaintiff has failed to plead detrimental reliance. (Doc. 28 at 16-21; doc. 40 at 7-9). In response, the Plaintiff states:

> Put succinctly and informally, Plaintiff alleges that he detrimentally relied by (1) continuing to work for NCR instead of retiring as planned, and for less compensation (about half) than was promised; and (2) exerting extraordinary efforts to meet and exceed the 2015 AEO revenue targets. Thus, Defendant's argument that Plaintiff failed adequately to plead detrimental reliance is demonstrably without merit.

(Doc. 36 at 15; *see also,* doc. 36 at 14-15 (citing and discussing pertinent paragraphs in the Amended Complaint)). The Defendant responds that "[t]he actions that Muncher claims to have taken because of the alleged misrepresentations do not satisfy the element of detrimental reliance . . . because the actions he took were not to his detriment and were not reasonable under the circumstances." (Doc. 28 at 18; *see also*, doc. 28 at 18 (quoting allegations from the Amended Complaint).

In support of its argument, the Defendant cites two Alabama cases which it contends stand for the proposition that, in the employment context, the Plaintiff must prove that he suffered some sort of damage because took or continued a job with the Defendant. In *Kidder v. AmSouth Bank, N.A.*, 639 So. 2d 1361, 1363 (Ala. 1994), the Alabama Supreme Court, in answering a certified question, held that a plaintiff, who was an employee at will, could maintain an action alleging fraud in the inducement of her employment based upon alleged misrepresentations, prior to her becoming

employed, as to her working conditions. The Court first noted that "'the showing of a loss of employment is legally inadequate to show the element of damage in a fraud claim by an at-will employee against his or her employer.'" *Kidder*, 639 So. 2d at 1362. It then held that the plaintiff could maintain a fraud claim because, in reliance of the representations of the defendant, she had left her former job. *Id.* In *Shaddix v. United Ins. Co. of Am.*, 678 So. 2d 1097, 1098 (Ala. Civ. App. 1995), *writ quashed as improvidently granted sub nom. Ex parte United Ins. Co. of Am.*, 678 So. 2d 1100 (Ala. 1996), the Alabama Supreme Court similarly held that an at-will employee could maintain a fraud claim after being terminated, in part because the plaintiff's complaint "clearly allege[d] damages resulting from misrepresentations that, he says, induced him to continue his employment to his detriment. [The plaintiff] claims damages for emotional distress because, he says, he continued to work for [the defendant] as a result of the alleged misrepresentations and suppression when he otherwise would have left its employ." The Defendant in the instant case argues that, unlike in *Kidder* and *Shaddix*, the Plaintiff has no damages from his reliance on the Defendant's representations.

The Defendant's reliance on *Kidder* and *Shaddix* is misplaced. The instant case is not the pure "employment-at-will" context where the plaintiff merely makes a fraud claim because he was fired, his damages being only that he would no longer be paid

and had no job. Instead, in the instant case, the Plaintiff alleges that the Defendant fraudulently induced him to perform, in exchange for the promise of the bonus, which <u>he earned and was never paid</u>. The measure of his reliance, and his damage, is <u>the amount of the bonus</u>. As this Court has already explained, "[t]he fact that the measure of damages may be the same for both causes of action does not make the fraud claim disappear." *Dickinson*, 882 So. 2d at 304 (J. Houston concurring specially) (internal citations and quotations omitted).[20] For this same reason, and because they are not binding on this Court, the Court rejects the holdings of the cases from "outside this jurisdiction" cited by the Defendant. (*See* doc. 28 at 20).

The Motion To Dismiss will be **DENIED** as to the fraud-based claims in Counts Two and Three.

## 2. *The Claim for Attorney's Fees (Count Four)*

Count Four of the Amended Complaint seeks attorney's fees. "[The] basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees . . .." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164, 192 L. Ed. 2d 208 (2015). "'In an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right

---

[20] *See also*, *supra* note 12.

to attorney's fees or giving a right thereto ... should be followed.'" *Smith v. GTE Corp.*, 236 F.3d 1292, 1305 (11th Cir. 2001) (*quoting Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975) (citations and quotations omitted)). "'Alabama recognizes exceptions to the American Rule where fraud, willful negligence or malice has been practiced.'" *King Dev. & Realty, Inc. v. Eslami*, 964 So. 2d 51, 57 (Ala. Civ. App. 2007) (*quoting Reynolds v. First Alabama Bank of Montgomery, N.A.*, 471 So. 2d 1238, 1243 (Ala. 1985)).

In the instant case, the mere assertion of a claim of "fraud" does not abrogate the American Rule. As the Eleventh Circuit has noted:

> The Alabama Supreme Court has, on one occasion, recognized an exception to the American Rule where "fraud, willful negligence or malice has been practiced." *See Reynolds v. First Alabama Bank of Montgomery, N.A.*, 471 So.2d 1238, 1242–43 (Ala.1985). However, the Alabama courts have apparently not extended the application of *Reynolds* beyond the facts of that case. Notably, the *Reynolds* court emphasized the case involved fraud on the part of a trustee which caused losses to the individual trusts of the class members, and thus, that the suit was "essentially an equitable proceeding." *Id.* at 1241. Moreover, the plaintiffs have not cited, and this Court has not found, any decision in the fifteen years since *Reynolds* where an Alabama appellate court has shifted attorney's fees to a defendant because it had committed fraud. For these reasons, we conclude that application of the "fraud" exception alluded to in *Reynolds* is too speculative to serve as a basis for including an award of attorney's fees in determining the amount in controversy in this case.

*Smith*, 236 F.3d at 1309 n. 16. This Court has only uncovered two reported Alabama cases, since *Smith*, where courts have awarded attorneys fees based on the exception set out in *Reynolds*. In *King Dev. & Realty, Inc. v. Eslami*, 964 So. 2d 51, 57–58 (Ala. Civ. App. 2007), the Alabama Court of Civil Appeals upheld an award "for unnecessarily relitigating . . . matters that had previously been decided and/or that could have been decided in previous Alabama proceedings." *Leonard*, 204 So. 3d at 905. In *Eslami*, 964 So. 2d 51, the Court of Civil Appeals concluded that the facts before it

> [fell] within the parameters of the "special equity" exception to the American Rule discussed in *Reynolds*. The circuit court heard evidence from which it was authorized to find that Chris King, acting on behalf of King Development, maliciously and in bad faith refused to accept rent payments from Eslami, its tenant, with the intent to declare Eslami in default and to terminate the lease so as to gain possession of the valuable refrigeration equipment that the tenant had installed on the leased premises.

*Eslami*, 964 So. 2d at 58. Assuming *Smith* and *Eslami* are typical of the facts necessary for an Alabama Court to award fees, then the facts pled in the instant case fall well short.

Still, the Court cannot foreclose the possibility that, at some point, <u>evidence</u> may arise which would allow such a recovery. Further, the Court is not convinced that, for fee shifting to occur, it must be pled as a separate count. Accordingly, the

49

Motion To Dismiss Count Four will be **DENIED**.[21]

## B.      The Motion To Amend (Doc. 51)

The Plaintiff's Motion To Amend seeks to add a proposed "Count Five", which purports to set out a claim under the ASRCA. The Defendant argues that the purported amended is futile (doc. 52 at 3), and therefore not allowed, because the facts of this case cannot plausibly support a claim under the Act. *See, McCarty*, 605 F.3d at 870 ("A proposed amendment may be denied for futility when the complaint as amended would still be properly dismissed.").

The ASRCA provides that "[a] <u>principal</u> who fails to pay a <u>commission</u> . . . is liable to the sales representative in a civil action for three times the damages sustained by the sales representative plus reasonable attorney's fees and court costs." Ala. Code § 8-24-3. The act defines "principal" as

Any person who does <u>all</u> of the following:

a.      Engages in the business of manufacturing, producing, importing, or distributing a product or products for sale to customers who purchase the product or products for resale.

b.      Utilizes sales representatives to solicit orders for the product or products.

---

[21]  The Plaintiff also seeks Attorney's Fees under the ASRCA.   (Doc. 36 at 23).  Because the Court will not allow the Plaintiff to amend to state a claim under the ASRCA (*see infra*), that argument is moot.

c.    Compensates the sales representatives, in whole or in part, by commission.

ALA. CODE § 8-24-1(2) (emphasis added). The Defendant argues that NCR is not a "principal" because it does not compensate the Plaintiff, in whole or in part, by commission. (Doc. 52 at 10). Thus, the Court must turn to the ASRCA's definition of "commission." The Act defines "commission" as "[c]ompensation accruing to a sales representative for payment by a principal, the rate of which is expressed as a percentage of the dollar amount of certain orders or sales." ALA. CODE § 8-24-1(1).

The Defendant argues that the current First Amended Complaint and the proposed Second Amended Complaint do not plead facts which plausibly allege that the Plaintiff was paid on a commission basis. No Alabama Court has interpreted the phrase "commission" as set out in the statute. But the statute is clear that a "commission" must be "expressed as a percentage of the dollar amount of certain orders or sales." This language is not ambiguous or subject to interpretation. The Plaintiff has made no argument to the contrary.

As pled in the First and Second Amended Complaints, the payment which the Plaintiff seeks is not expressed as a percentage of the dollar amount of certain sales. The Plaintiff had a "Revenue Objective" in the amount of $39,591,000.00 (doc. 51-1 at 11, ¶46), and an "Annual Target Incentive" of $70,227.00 (doc. 51-1 at 11, ¶47).

The AEO provided that, if the Plaintiff achieved sales which were $2.5 million over his Revenue Objective, he would receive a minimum payment of 100% <u>of his target incentive</u>, or the full $70,227.00. (Doc. 51-1 at 11, ¶45). In addition, the AEO provided that the Plaintiff would receive an additional payment of 50% <u>of his target incentive</u>, or $35,113.50, for each $1 million in sales over his Revenue Objective. Thus, the Plaintiff's bonus was not expressed as a percentage of <u>sales</u>, as required by the ASRCA. The bonus itself is fixed and payable upon the Plaintiff reaching certain sales goals.

The Plaintiff argues that

the 2015 AEO bonus commissions . . . <u>can be</u> readily expressed as a percentage of the additional revenues or actual sales, earned by Plaintiff over and above his $39,591,000.00 annual sales quota, namely, a 2.8% commission on sales of $2.5 M over and above his sales quota (the first layer of the SCI bonus commissions), and 3.7% commission on each additional $1 M of sales over and above that amount (the "second layer" of the SCI bonus commissions). Thus, Defendant's argument that Plaintiff's bonus commissions were not expressed or calculated as a percentage of sales or orders is specious.

(Doc. 55 at 7-8) (footnote omitted). The Plaintiff misses the point with this argument. The Plaintiff was <u>never</u> entitled to a percentage of <u>sales</u>. He got a <u>bonus</u> if certain quotas were reached. He got <u>nothing</u> if they were not.

The Plaintiff cites *Loy v. B & P Process Equip. & Sys., L.L.C.*, No. 09-12728-BC, 2011 WL 3359578, at *1 (E.D. Mich. Aug. 4, 2011) (Ludington, J.)

which, he argues, "determined that the plaintiff employee's compensation program came soundly within [a similar act's] definition of 'commission'." (Doc. 55 at 9). The definition of "commission" is mentioned nowhere in *Loy*. Further, at page *2, the page cited by the Plaintiff (*see* doc. 55 at 8,9), the Court sees no discussion of whether the payments in *Loy* amounted to "commissions." Accordingly, the Court does not find *Loy* to be persuasive.[22]

The Court holds that the facts alleged in both the First Amended Complaint and the proposed Second Amended Complaint fail to plausibly allege that the Plaintiff was paid a commission. For this reason, the Motion To Amend will be **DENIED** as futile.

## IV. CONCLUSION

For the reasons stated herein, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that both the Motion To Dismiss (doc. 27) and the Motion To Amend (doc. 51) are **DENIED**. The stay previously entered in this case is hereby **LIFTED**. <u>**The parties are hereby ORDERED to file an Amended Report of Parties**</u>

---

[22] In a footnote, the Plaintiff also cites *Gustafson v. SAP Am., Inc.*, No. 4:14CV1497 SNLJ, 2015 WL 1526352, at *3 (E.D. Mo. Apr. 3, 2015) (Limbaugh, J.). (Doc. 55 at 9, n.15). That case <u>did</u> address whether the Plaintiff plausibly alleged a claim under a Missouri statute which was similar to the one in the instant case. However, the issue in *Gustafson* was whether the use of a formula to determine what sales consist of for purposes of commissions was acceptable. That court held that there was no prohibition against such a methodology. The issue was <u>not</u> whether, as in the instant case, bonuses paid upon reaching certain sales goals were commissions. The Court does not find *Gustafson* persuasive.

**Planning  no later than July 18, 2017.**

      **DONE** and **ORDERED** this 27th day of June, 2017.

**VIRGINIA EMERSON HOPKINS**
United States District Judge